OPINION
{¶ 1} Appellant, the State of Ohio, appeals the grant of Appellee Brittany Rae Schlarb's motion to suppress evidence of methamphetamine discovered by a county children's services social worker in appellee's apartment. The relevant facts leading to this appeal are as follows.
 {¶ 2} In January 2004, an anonymous tipster contacted the telephone "hotline" operated by the children's services unit of the Stark County Department of Job and Family Services ("SCDJFS"). The caller alleged that appellee, who had a child of approximately eighteen months of age, was maintaining a methamphetamine lab in her basement in Hartville, Ohio. SCDJFS assigned social worker C.J. Cross to handle the case.
 {¶ 3} Cross first contacted Detective Jim Monigold of the Stark County Metropolitan Narcotics Unit. Cross and Monigold unsuccessfully attempted personal contact with appellee at her residence on February 2, 2004. Later that month, Cross received no response when she knocked on appellee's door, so she left her business card. In the meantime, Monigold contacted Cross and advised her he had personally spoken with appellee and had discussed the meth lab allegation with her. Cross thereafter returned to appellee's residence and again left her card. Appellee made telephone contact with Cross on April 6, 2004, leading Cross to attempt another visit on April 8, 2004. However, she found no one home on that date.
 {¶ 4} On April 12, 2004, Cross returned, by herself, to appellee's residence. After she introduced herself as "C.J. from Children's Services," appellee let her enter. After some discussion, as further detailed infra, appellee showed Cross the bedroom, where Cross discovered white powder on a plate, along with a razor blade and a straw. Appellee told Cross it was "speed, meth." Tr. at 16. Cross also observed small white baggies with apparent marijuana residue. Soon thereafter, Cross heard rumbling noises in the basement. When asked about the noise, appellee stated her roommate was in the basement. Cross then dialed 911 and spoke with Monigold.
 {¶ 5} Two Hartville police officers were dispatched to the residence. They obtained verbal consent from appellee to look around the apartment. Monigold and other Metro officers also proceeded to the residence. The officers obtained a written consent to search from appellee, leading to the discovery of additional drug evidence and drug paraphernalia, including a scale and three pipes with residue.
 {¶ 6} Appellee was thereafter arrested for possession of methamphetamine and drug paraphernalia. The Stark County Grand Jury later indicted appellee on one count of aggravated possession of drugs, a felony of the fifth degree. Appellee pled not guilty, and filed a motion to suppress the results of the search of her residence, alleging that the search was without a warrant, without probable cause, and against her consent. The court conducted a suppression hearing, following which the court ruled that appellee's consent was not voluntarily given. The court thereupon suppressed the evidence from the search on Fourth Amendment grounds.
 {¶ 7} The State timely appealed (see App.R. 4(B)(4)), and herein raises the following sole Assignment of Error:
 {¶ 8} "I. The trial court erred in sustaining appellee's motion to suppress when appellee voluntarily consented to the search of her residence by an employee of the stark county department of jobs (sic) and family services."
 I. {¶ 9} In its sole Assignment of Error, the State argues the trial court erred in granting appellee's motion to suppress. We agree.
 {¶ 10} There are three methods of challenging, on appeal, a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. See State v. Fanning
(1982), 1 Ohio St.3d 19, 437 N.E.2d 583; State v. Klein (1991),73 Ohio App.3d 486, 597 N.E.2d 1141; State v. Guysinger (1993),86 Ohio App.3d 592, 621 N.E.2d 726. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See State v. Williams (1993),86 Ohio App.3d 37, 619 N.E.2d 1141. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry (1994), 95 Ohio App.3d 93,641 N.E.2d 1172; State v. Claytor (1993), 85 Ohio App.3d 623,620 N.E.2d 906; Guysiner, supra.
 {¶ 11} In the case sub judice, the State challenges both the findings of fact (see Fanning, supra), and the trial court's decision concerning the ultimate issue raised in appellee's motion to suppress (see Curry,
supra). As we find the second challenge dispositive of the appeal, we will proceed directly to an analysis thereof. Thus, in analyzing the State's sole Assignment of Error, we will independently determine whether the facts meet the appropriate legal standard.
 {¶ 12} As an initial matter, the State does not dispute the trial court's conclusion that Cross acted as an agent of the state under the circumstances of the case. See Appellant's Brief at 15. We therefore must consider whether appellee voluntarily consented to Cross's search of her residence, as it is well-established a defendant waives his or her Fourth Amendment protection by consenting to a warrantless governmental search. See State v. Barnes (1986), 25 Ohio St.3d 203, 208, 495 N.E.2d 922, citing Davis v. United States (1946), 328 U.S. 582, 66 S.Ct. 1256,90 L.Ed. 1453; Schneckloth v. Bustamonte (1973), 412 U.S. 218,93 S.Ct. 2041, 36 L.Ed.2d 854; State v. Pi Kappa Alpha Fraternity (1986),23 Ohio St.3d 141, 491 N.E.2d 1129.
 {¶ 13} "The standard of proof to show a waiver of Fourth Amendment rights is less strict than that required to demonstrate a waiver of Fifth or Sixth Amendment rights. It need not be shown that there has been a knowing and intelligent waiver. Rather, the court must examine the totality of the circumstances to determine the voluntariness of consent."Barnes, supra, citing Schneckloth, supra; United States v. Mendenhall
(1980), 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497. Id. at 208-209. When making this determination, the state must show by clear and convincing evidence that the consent was freely and voluntarily given. State v.Gouveia (Oct. 25, 1989), Ashland App. No. CA-925. In addressing the issue of voluntariness, a court should consider the following six factors: (1) The voluntariness of the defendant's custodial status; (2) The presence of coercive police procedures; (3) The extent and level of the defendant's cooperation with the police; (4) The defendant's awareness of his right to refuse to consent; (5) The defendant's education and intelligence; and (6) The defendant's belief that no incriminating evidence will be found. State v. Hall (Dec. 14, 2000), Tuscarawas App. Nos. 2000AP030025, 2000AP030026, citing State v. Webb (Jan. 28, 2000), Montgomery App. No. 17676 (additional citations omitted).
 {¶ 14} The testimony at the suppression hearing indicates that appellee opened her apartment door and let Cross into the residence during the incident at issue. Tr. at 12. Cross then asked appellee about her present drug use and the purported meth lab, both of which appellee denied. Tr. at 13. Appellee also told Cross the child was currently at the maternal grandmother's house. The direct examination of Cross continues as follows:
 {¶ 15} "A. * * * And we proceeded to talk about, ah, her past drug use, where, if and where she works and then she willingly took me through her apartment.
 {¶ 16} "Q. Okay. And when you say she willingly took you, what happened specifically? What did you say and what did she say?
 {¶ 17} "A. Ah, I'd asked her if she could show me the rest of the apartment. And, um, she did. We went —
 {¶ 18} "Q. Did she respond or she (sic) just start showing you?
 {¶ 19} "A. Um, she said she had no problem. It wasn't an issue.
 {¶ 20} "Q. Okay.
 {¶ 21} "A. She wanted — go ahead.
 {¶ 22} "Q. When you went to the apartment, what was your main goal at that point?
 {¶ 23} "A. Um, to check on the welfare of the child.
 {¶ 24} "Q. Okay.
 {¶ 25} "A. And to address the drug use." Tr. at 13-14.
 {¶ 26} Appellee then showed Cross the kitchen and the child's bedroom. Cross testified this was accomplished in order to ascertain that the child had enough food, clothing and bedding, and that the area was clean. Tr. at 14-15. The testimony continued as follows:
 {¶ 27} "A. Ah, we proceeded to go back downstairs and she had gone into her bedroom to get a shirt. And, um, I asked to see the bedroom.
 {¶ 28} "Q. And how did she respond to that?
 {¶ 29} "A. She said it was messy and, um, I said that I understood that. And she opened the door and we walked in.
 {¶ 30} "Q. What happens when you walk into her bedroom?
 {¶ 31} "A. I observed a plate with white powder, a razor blade and a straw.
 {¶ 32} "Q. Okay.
 {¶ 33} "A. On her dresser.
 {¶ 34} "Q. Okay. Were you alarmed at that point?
 {¶ 35} "A. Can you —
 {¶ 36} "Q. Let me ask you this: When you saw that, did that raise any suspicion?
 {¶ 37} "A. Oh, definitely.
 {¶ 38} "Q. And what suspicion?
 {¶ 39} "A. I asked her what that was. * * *.
 {¶ 40} "A. She said it was speed, meth." Tr. at 15-16.
 {¶ 41} After appellee handed the methamphetamine over, Cross asked her "if there was anything else, any other drugs that were, that was in her home." Tr. at 16. Appellee then looked around the room and handed Cross some apparent marijuana residue and ashes from atop the dresser. Id. Cross thereafter heard some "rumbling" in the basement, which appellee identified as her male friend and occasional roommate. Cross then moved back into the living room area and contacted Detective Monigold via 911 from her cell phone, as outlined in our recitation of the facts of the case, supra. Cross summarized that during the entire time she was in the apartment, appellee was cooperative with her. Tr. at 21.
 {¶ 42} The circumstances of this case may tend to evoke policy questions as to the interplay between local drug enforcement and the provision of children's services; however, the focus of this Court remains on the strict issue of whether appellee's Fourth Amendment rights were violated under the facts presented. Returning to consideration of the six "voluntariness" factors pursuant to Hall, supra, we note Cross indicated she did not inform appellee of her right to refuse the search. Tr. at 31. In addition, Cross described appellee's voice as "jittery" and noted her eyes were "darting." Tr. at 40-41. Cross conceded that these were possible indicia of nervousness, but testified that they also indicated use of methamphetamine. Tr. at 41. Nonetheless, upon review, we otherwise find abundant support for concluding that appellee voluntarily consented to all aspects of the search. As in our opinion in State v. Kinstle,
Ashland App. No. 02 COA 36, 2003-Ohio-519, the record in this case gives no indication that appellee portrayed any significant lack of education or intelligence. Indeed, Cross stated during cross-examination that her initial conversation with appellee centered on the allegations of drug use and the purported meth lab (Tr. at 28), indicating Cross was straightforward on this point with appellee from the outset. The trial court rhetorically asks in its entry: "Knowing that her child's ability to stay with her may be in the balance, is the owner really going to deny the investigator the ability to check out the property?" Judgment Entry at 3. However, we do not concur with the implicit presumption, strongly suggested by this question, that the involvement of a children's services caseworker in an investigative situation is inherently coercive. In addition, Juv.R. 6 permits a law enforcement officer also to take temporary custody under certain conditions, i.e., to put custody in the balance, whether or not a caseworker is immediately present at the scene.
 {¶ 43} Accordingly, we hold the trial court erred in concluding a Fourth Amendment violation had occurred and granting the motion to suppress under the facts and circumstances of this case. The State's sole Assignment of Error is therefore sustained.
 {¶ 44} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby reversed and vacated.
Wise, J., Gwin, P.J., and Farmer, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio, is reversed and vacated.
Costs to be split evenly between the State of Ohio and appellee.